772 August 20, 2025 No. 746

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SAMUEL CHRISTOPHER KURZ,
*Defendant-Appellant.*

Josephine County Circuit Court
21CR32499; A181151

Pat Wolke, Judge.

Argued and submitted May 15, 2025.

Meredith Allen, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patrick M. Ebbett, Assistant Attorney General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

JACQUOT, J.

Reversed and remanded.

Kamins, J. dissenting.

**JACQUOT, J.**

Defendant appeals a judgment of conviction for one count of first-degree sexual abuse, ORS 163.427; one count of luring a minor, ORS 167.057; one count of second-degree unlawful sexual penetration, ORS 163.408; and two counts of second-degree sodomy, ORS 163.395.[1] On appeal, defendant raises five assignments of error. Ultimately, his fifth assignment of error, in which he contends that the trial court erred by denying his motion for a mistrial, is dispositive. We agree with defendant that the trial court erred in denying his motion for a mistrial.[2] Consequently, we reverse and remand.

## BACKGROUND

The charges against defendant are based on conduct that the state alleges he committed against a minor child, J, while he was living with J and her mother.

During defendant's trial, the state presented evidence that, when J was around six or seven years old, while J was pretending to be asleep, defendant made her rub his penis. That conduct served as the basis for one of the charges of first-degree sexual abuse.

Additionally, during defendant's trial, the state presented evidence that, during an incident when J was around 12 years old, defendant subjected J to various sexual contact, including touching her vagina, penetrating

---

[1] Defendant was charged with two other counts of first-degree sexual abuse. He was acquitted on one of those counts and one of those counts was merged into his conviction for one count of second-degree unlawful penetration.

[2] In his first assignment of error, defendant contends that the trial court erred by overruling his objection to certain testimony. But defendant's objection to that testimony came too late; the objection came in response to a different question asked by the prosecutor and the objection would not have alerted the trial court that defendant was objecting to the particular testimony that he now asserts should not have been admitted into evidence. Consequently, his first assignment of error is unpreserved. *State v. Ardizzone*, 270 Or App 666, 672, 349 P3d 597, *rev den*, 358 Or 145 (2015) ("To preserve a claim of error, the party must provide the trial court with an explanation of his objection that is specific enough to afford the court an opportunity to analyze any alleged error.").

Defendant's second through fourth assignments of error assert various reasons why, in defendant's view, the trial court erred in "failing to declare a mistrial." Our resolution of defendant's fifth assignment, in which he asserts that the trial court erred in "denying defendant's motion for mistrial" on the same bases identified in his second through fourth assignments of error, obviates the need to address his second through fourth assignments of error.

her vagina with his finger, and causing J to engage in oral sexual intercourse with him. That conduct served as the basis for one count of first-degree sexual abuse, one count of second-degree unlawful sexual penetration, and two counts of second-degree sodomy.

Finally, as the basis for the charge of luring a minor, during defendant's trial, the state presented evidence that during the incident when J was around 12 years old defendant showed her pornography for the purpose of inducing her to engage in sexual contact with him.

Throughout defendant's trial, in making its case the jury, the state introduced evidence of what defense counsel in the trial court referred to as defendant's "sexual proclivities." That is, the jury heard testimony about defendant's sexual conduct and history—*e.g.*, that he watches pornography at night while falling asleep; that he had been sexually assaulted; that he owned dildos, one of which his ex-wife used on him; that he uses a product called Rush, which "makes you kind of dizzy and is supposed to enhance orgasms"; that during the summer he would wear a sarong "around his waist with nothing underneath" and it would "flip open all the time," including when J was around; and that he had, historically, had sexual contact with men and women.

In particular, the state presented testimony from an Oregon Department of Human Services (ODHS) worker who interviewed defendant after J disclosed defendant's alleged conduct. That ODHS worker testified that there was a "concern about [defendant] watching inappropriate child pornography"—although there was no evidence during defendant's trial that defendant either possessed or viewed "child pornography"—and that defendant discussed his "sexual preferences" with the ODHS worker in connection with that concern:

"[PROSECUTOR]:   Okay. And during that interview, did he talk to you about his sexual preferences?

"[ODHS WORKER]:   Yes. We did discuss sexual preferences during that time.

"Q.   And what was the context of that? How did that come up?

"A.   We discussed—part of the concern was watching inappropriate child pornography, and he discussed with me several of his preferences, including multiple sex partners, bestiality. There was a wide variety of topics that we discussed about his preferences.

"*****

"Q.   Was there any specific sexual preferences that he discussed with you during the interview?

"A.   He did talk about specifics such as bukkake or multiple partners on one person. And that's pretty much the gist of it."

Additionally, regarding the pornography that defendant allegedly showed to J, the state introduced a video of J's forensic interview with the Children's Advocacy Center of Josephine County (CAC), describing the content of that pornography from J's perspective:

"[INTERVIEWER]:   And then you kind of had said like there's a pretty wide variety of pornography. Anything that stood out?

"[J]:   There was one where it was—it was recordings of like—I think it was called a glory hole or something like that. And there was like ones where there was transgenders. There was girls with dicks, and there was ones that they had like role plays and weddings."

Finally, J's mother testified that defendant had "all kinds of different porn" and that he would view it and "play[] with himself" while the bedroom door was open and J was home.

After the state presented its case-in-chief, defendant, as is his constitutional right, did not present any evidence, and the trial proceeded to closing argument.

There are three aspects of the prosecutor's closing argument that defendant challenged as improper in the trial court, and he contends that, as a result of those aspects of the prosecutor's closing argument, the trial court should have granted a mistrial.

First, when discussing the luring of a minor charge, the prosecutor asserted that defendant showed J "child

porn," notwithstanding that there was no evidence that defendant actually possessed "child porn" or showed it to J. Defendant objected to the statement, however, and the prosecutor clarified that she meant "regular porn":

"[PROSECUTOR]:   [T]he elements [of luring a minor] are:

"1.   The act occurred on or between February 13th of 2020 and February 13th of 2021;

"2.   [Defendant] knowingly furnished to and/or used with [the victim] a visual representation of sexual conduct;

"3.   [Defendant] furnished to and/or used the representation for the purposes of inducing a minor or purported—inducing a minor to engage in sexual conduct.

"Now, *it's a very wordy way of saying he showed her child porn for the purposes of getting her to engage in sexual contact with him.*

"Again, another knowing—

"[DEFENSE COUNSEL]:   Your Honor, I'm—

"[PROSECUTOR]:   —element with that—

"[DEFENSE COUNSEL]:   —going to object. There's been no evidence of child pornography in this case at all.

"[PROSECUTOR]: There was sufficient testimony about that. Both the victim and [the victim's mother]—

"THE COURT:   Well—

"[PROSECUTOR]:   —testified about that

"THE COURT:   —hold on. There's no evidence of what?

"[DEFENSE COUNSEL]:   There's no evidence of child pornography in this case at all.

"[PROSECUTOR]:   Oh, shoot. Sorry.

"[DEFENSE COUNSEL]:   You just said child porn.

"THE COURT:   Correct.

"[PROSECUTOR]: I realize—yeah. My apologies. Pornography. I realize what you're saying now.

"* * * * *

"[PROSECUTOR]: Defense is correct. I meant regular pornography. My apologies, folks. So sorry. So sorry. Talking about children, and porn, and mixed the words. I apologize guys."

Second, the prosecutor commented on defendant's right to trial, and asserted that he did not dispute the evidence against him:

"Now, the Defendant, *** disputes the allegations. Defense told you so in opening at the start of trial, but in all reality we are here because [defendant] has a constitutional right to a jury trial. We are not here because there is a dispute in the evidence. And you guys saw all of the evidence presented. You saw [J's] CAC interview. You heard from eight other witnesses that testified to different things that supported her CAC interview."

Further, because it is relevant to our analysis of whether that comment by the prosecutor was prejudicial, we note that, later during her closing argument, the prosecutor highlighted what she characterized as defendant's failure to deny that he engaged in the charged conduct when he was interviewed by police.[3] That interview with police came in response to an ODHS report that J's uncle had made, and defendant told police, "I don't know if [J's uncle] made it up." The prosecutor encouraged the jury to infer defendant's guilt from his purported failure to deny that he engaged in the charged conduct when interviewed by police:

"When [defendant's] being confronted by the DHS report made by [J's uncle], he says, 'I don't even know if he made it up.' If somebody reports you to DHS and you're being confronted [by police] with what they reported you for, why would you say, 'I don't even know if he made it up.' Either you did it or you didn't do it. *If you didn't do it, you say, 'I didn't do it. I don't know what he's talking about. He's lying.'* I don't know if he made it up. *** He thought he was being clever.

"During that interview with detectives, you heard from [a detective] how [defendant] spent a good portion of his time talking about his medical issues and he was very relaxed. If you were being confronted with sexual abuse

---

[3] Defense counsel, during his closing argument, asserted that defendant did deny the allegations when he was speaking with police.

allegations, you're sitting in a detective's car, why are you relaxed? Why are you talking about your medical issues? Why are you saying, 'I don't even know if he made it up'? That's because he did what [J] said he did, and he knew it."

(Emphasis added.)

The third aspect of the prosecutor's closing argument that the defendant challenges is the prosecutor twice referring to defendant as a "monster":

"[J's mother] thought that she had found the love of her life, her soul mate. So of course she trusted him. You're in a relationship—a longtime relationship—and you live with a man, you've been together 10 years, engaged almost the whole time, and the only father figure that your young daughter has known. So of course, of course you would leave that kiddo with him. *Not knowing what was going on, not knowing the monster you were leaving her with.*

"* * * * *

"She didn't know that she needed to safeguard [J] from her fiancé. The love of her life. The only real father figure that [J] had had. [Defendant] even said the same thing in his interview with detectives. *She didn't know the monster that lurked in their home.*"

(Emphases added.)

After the state finished its closing argument, and before defendant's closing argument, the trial court asked the jury to "take a brief recess now in the jury room," and it *sua sponte* raised a concern regarding the prosecutor's statement that "we are here because [defendant] has a constitutional right to a jury trial" and "we are not here because there is a dispute in the evidence." It stated:

"Here's what I thought I heard during [the state's] closing argument: 'We are here today because he has the constitutional right to a trial.' And then I believe she went on and said, 'He does not dispute the evidence.' Did I hear that?"

Defense counsel responded:

"Yes, you did hear that right, Your Honor, and I was actually—I was waiting for the right time to make this, I

actually move for a mistrial at this time for a number of things that [the state] said in her closing."

Defendant then pointed out that, during closing, the state "called my client a monster twice," "misstated the evidence that my client does not dispute it," and "she also referred to child porn." Regarding the prosecutor's comment about "child porn," defendant explained his concern that "the jury knows there's certain evidence that's not going to come in" and that "they're going to be wondering whether [the prosecutor] let one slip ***."

The trial court stated that it would provide a curative instruction, to

"basically say that [the prosecutor] misspoke when she said that [defendant] does not dispute the evidence. He does dispute the evidence. He's pled not guilty in this case. He denied the allegations to the detective when interviewed, and he has an absolute constitutional right not to testify[.]"

It then stated, "with that curative instruction, I think that we're going to avoid a mistrial." At that point, defense counsel told the trial court that he did not "think that was sufficient." Defense counsel did not propose an alternative curative instruction, however, and took the position that "I don't think it can be cured and I think a mistrial is warranted."

The trial court denied the motion for mistrial but determined that the prosecutor's comment that defendant "does not dispute the evidence" was a "comment on his right to remain silent, which we cannot do."

Before defendant's closing argument, the trial court provided the following curative instruction to the jury:

"Ladies and gentlemen, just briefly, during [the state's] opening—or closing argument, she said two things that were kind of contradictory. First, she said that [defendant] disputes the evidence, and then later shortly after that she says we're not here because he disputes the evidence.

"So, I just want to clarify that [defendant] very much disputes the evidence. He's pled not guilty to these charges. He denied the allegations when he was interviewed by the state policemen, and he has an absolute constitutional

right not to testify, and a right that people can't comment on his not testifying. And I'll tell you more about that in just a moment."

During the beginning of her rebuttal argument, presumably in an effort to cure any prejudice caused by her argument that there was not a "dispute in the evidence," the prosecutor reiterated that defendant "disputes the evidence":

"So my first closing, I told you the Defendant disputes the evidence, I told you that several times. That's what he told the detectives. That's what he told [the ODHS worker]. And I may have misspoken earlier, which is why you got the curative instruction. Just so we're clear, I'm not saying that he doesn't dispute it. He clearly disputes it, it's been evident from the trial and from the evidence. My reference was to, from the State's perspective, there's no issue with the evidence. There's nothing to argue about because the evidence is clear. It's beyond a reasonable doubt that he abused that girl."

The prosecutor went on to describe a pretext phone call that J's mother made to defendant in which, in the prosecutor's view, defendant did not deny the allegations against him when confronted with them, and again she argued to the jury they should draw an inference of guilt from his failure to deny the allegations against him:

"Now, since [defendant] brought up the pretext phone call—I was saving that for my rebuttal—if you go back and listen to it again, he doesn't say, 'No, I didn't do anything.' He says, 'No, she can't be pregnant because there was no sex.'

"And then [J's mother] says, 'Well, it's the masturbation, whatever else you won't tell me. And then he's like, 'Well, you were threatening me, blah, blah, blah, blah, blah.'

"Go back and listen to it. He doesn't say, 'No, none of that happened.' He skirts around the question. *If you didn't do it, you'd just say, 'I don't know what you're talking about. I never did any of that.' In all of his responses, he's skirting around the question.*"[4]

(Emphasis added.)

---

[4] Defense counsel had a different interpretation of the pretext phone call, asserting during his closing argument:

Finally, while instructing the jury after the prosecutor's rebuttal, the trial court explained that defendant has a right not to testify or present evidence:

"A defendant has an absolute constitutional right not to testify. Therefore, a defendant's decision not to testify cannot be considered as an indication of guilt. It should not be commented on or in any way considered by you in your deliberations.

"A defendant also has an absolute constitutional right not to present any evidence. Therefore, a defendant's decision not to present any evidence cannot be considered as an indication of guilt. It should not be commented on or in any way considered by you in your deliberations."

After deliberating, the jury returned guilty verdicts on two counts of first-degree sexual abuse, one count of luring a minor, one count of second-degree unlawful sexual penetration, and two counts of second-degree sodomy.[5]

Prior to defendant's sentencing, defendant moved for a new trial due to the various statements the prosecutor made during her closing argument, and the trial court denied the motion. When doing so, it noted its recollection that there was evidence that defendant had shown J "child pornography," but the prosecutor corrected the trial court, explaining that there was not in fact such evidence presented at trial:

"[THE COURT]:   I do remember there was at least a conversation about child pornography at some point during the testimony. And so—and when it was said, I thought that was the—what was going on, I thought there was a joint viewing of child pornography, but maybe it was just sexually explicit videos. Wasn't there that testimony?

"[THE PROSECUTOR]:   There was no actual testimony about the child pornography.

"THE COURT:   Wasn't there testimony that the victim and [defendant] looked at—

"[THE PROSECUTOR]:   They had viewed—

---

"'[Defendant] just—he stops answering anymore questions, [J's mother] tries to pursue it, he says, 'No, and I'm done talking to you about this.' He denied. He didn't know law enforcement was watching at that time, but he denied."

[5] At sentencing, one count of first-degree sexual abuse merged into the one count of second-degree unlawful sexual penetration.

"THE COURT:   —videos together?

"[THE PROSECUTOR]:   —pornography, but nothing about child pornography."

## ANALYSIS

As noted above, on appeal, defendant contends that the trial court erred in denying his motion for a mistrial, which was made after the state's closing argument. Before turning to the merits of that issue, we address preservation, because the state contends that defendant failed to preserve his argument that a mistrial was required, and we also address our standard of review.

A.  *Preservation*

The state argues that defendant's motion for mistrial was untimely because defendant did not "promptly move for a mistrial after any of the statements he now challenges on appeal—and instead only moved for a mistrial at the conclusion of the prosecutor's argument." Defendant responds that his motion for mistrial was "timely enough so that the issue is preserved, because the motion came in time for the trial court to cure the problem if such cure were possible."

"A motion for mistrial may *** be deemed timely even if not instantaneously made, when made under such circumstances that the underlying purpose of that preservation requirement is fulfilled in the particular case." *Dept. of Human Services v. J. E. D. V.*, 326 Or App 149, 156, 531 P3d 683 (2023) (internal quotation marks omitted). "We take a nuanced approach to assessing the timeliness of mistrial motions that considers a number of factors with a view to ensuring that the foundational principles of the preservation requirement were met." *Id.* at 156-57 (internal quotation marks omitted).

> "Those factors include how much time elapsed between the allegedly objectionable basis for the motion and the objection itself; whether additional testimony was heard, evidence was received, or issues were discussed; whether the trial court and nonmoving party were aware of the moving party's objection; whether the moving party may have made a strategic choice in delaying the mistrial request;

whether the trial court had an opportunity to take prompt
curative action; and whether the nonmoving party objected
to the mistrial motion as untimely."

*Id.* at 157.

Here, we conclude that the foundational principles
of the preservation requirement were met, and that defen-
dant's motion for mistrial was therefore timely. Although
defendant did not make the motion until the prosecutor had
finished her closing argument, the trial court had the oppor-
tunity to take prompt curative action—and indeed, it pro-
vided a curative instruction at that time. Further, the state
did not object to the motion as untimely, nor did the trial
court express any concern that the motion was untimely.
Finally, the motion was made a relatively short time after
the statements defendant believed to be objectionable were
made. *State v. Veatch*, 223 Or App 444, 454, 196 P3d 45
(2008) (motion for mistrial preserved where, among other
facts, "defendant's counsel waited only a short time before
making the motion; indeed, he made it at the next break in
the trial").[6]

---

[6] In the dissent's view, defendant did not preserve his motion for mistrial,
because he "allowed the incident to pass by." 342 Or App at 796 (Kamins, J.,
dissenting). Mistrial motions, of course, "are favored at the time when the objec-
tionable act occurs." *State v. Quebrado*, 372 Or 301, 312, 549 P3d 524 (2024).

As the Supreme Court has explained, however, "[o]ne pragmatic touchstone
of preservation in the context of a motion for mistrial is whether the parties and
the trial court would have been in a superior position to cure the deficiency if the
motion had been raised earlier in the proceedings." *Id.* at 313. And it is the trial
court and the parties that are in the best position to make that assessment. *Id.* at
315. (noting that the trial court and the parties were "in the best position to eval-
uate whether taking up the issue [of mistrial] on Tuesday morning, as opposed to
Thursday afternoon, placed the court in a worse position to be able to address the
error; no one so indicated").

Here, we highlight that the trial court, like defendant, was concerned about
the prosecutor's improper comment on defendant's exercise of his constitutional
rights, which as explained below, we consider to be the most prejudicial aspect of
the prosecutor's improper closing argument. And the trial court waited until the
end of the prosecutor's closing argument to raise it and to discuss it and offer a
curative instruction. As noted, neither the trial court nor the state at that time
indicated that defendant's motion for mistrial had come too late. *Compare id.*
at 304-05 (in evaluating whether a mistrial motion was untimely, even "more
important[]" than the fact that there was no "significant event *** in the trial"
between when a mistrial motion could have been made and when it was made,
was that "neither the state nor the trial court expressed any concerns about time-
liness or prejudice") *with State v. Oxford*, 336 Or App 637, 645, 561 P3d 679 (2024)
(motion to strike untimely where, among other facts, trial court explained that

B.   *Standard of Review*

Having concluded that defendant's motion for a mistrial was not untimely, we turn to our standard of review.

"When a party moves for a mistrial, the trial court must decide whether to grant the motion, deny the motion but take curative steps, or deny the motion without taking any curative steps." *State v. Northey*, 340 Or App 318, 330, 517 P3d 219 (2025). "The trial court's decision is reviewable for an abuse of discretion, taking into consideration the seriousness of the prejudice and the manner in which the court sought to cure the error, with the decisive issue [being] whether defendant's ability to receive a fair trial was impaired." *Maney v. Angelozzi*, 285 Or App 596, 614-15, 397 P3d 567 (2017) (internal quotation marks and citations omitted; brackets in *Maney*). That is, ultimately, "an appellate court is required to decide whether, under the circumstances as a whole, defendant was denied the right to a fair trial, as a matter of law, by the events that transpired at trial." *State v. Chitwood*, 370 Or 305, 312, 518 P3d 903 (2022) (internal quotation marks omitted).

"For a trial to be fair, the verdict must be based on the evidence, not external factors." *Northey*, 340 Or App at 330. We have stated that whether the prosecutor's misconduct was inadvertent or intentional is "simply not relevant to the question whether the prosecutor's actions affected defendant's right to a fair trial." *State v. Osorno*, 264 Or App 742, 751-52, 333 P3d 1163 (2014).

When a trial court gives a curative instruction in response to a motion for mistrial, "we must consider the sufficiency of [that] instruction." *State v. Schumacher*, 315 Or App 298, 305, 500 P3d 698 (2021). That is because the "harmful effect" of "prosecutorial misconduct" may be "obviated by

the defendant's failure to raise a contemporaneous objection "placed the court in a worse position to be able to address the error").

Further, after trial, defendant moved for a new trial based on the prosecutor's comments during closing argument, and the trial court denied the motion, in part because the instruction provided what was, in its view, "*an immediate*[] and *** explicit curative instruction." (Emphasis added.)

Although ideally defendant would have moved for a mistrial earlier, in consideration of the factors set forth in *J. E. D. V.*, on this record, defendant's mistrial motion was adequately preserved.

a proper instruction." *State v. White*, 303 Or 333, 342, 736 P2d 552 (1987). As a result, "[t]he dispositive question" in reviewing the denial of a motion for mistrial based on prosecutorial misconduct "is whether the purportedly curative instruction was sufficient to unring the bell." *Id.* at 342; *see also State v. Hunt*, 297 Or App 597, 605, 442 P3d 232 (2019) (citing *White* for that proposition). A trial court abuses its discretion in denying a motion for mistrial where the "state's *** argument was prejudicial to the defense and the trial court's instruction was insufficient to cure that prejudice ***." *State v. Cox*, 272 Or App 390, 412, 359 P3d 257 (2015).

Moreover, when a defendant moves for a mistrial, "it is the court, not defendant, that must decide whether to grant the motion, to cure the effect of inappropriate conduct or testimony by giving a proper instruction instead, or to do nothing at all." *State v. Swanson*, 293 Or App 562, 571, 429 P3d 732 (2018) (internal quotation marks omitted). Thus, a defendant's failure to object to the sufficiency of a curative instruction offered by the court in response to a motion for mistrial does not render an otherwise preserved motion for mistrial unpreserved. *Veatch*, 223 Or App at 454-55 (2008) ("In short, if the court chooses to give a curative instruction rather than declare a mistrial, any error in denying a preserved mistrial motion remains preserved regardless of whether the defendant objected to the sufficiency of the instruction."); *see also Swanson*, 293 Or App at 570 (in reviewing the denial of a motion for mistrial, attaching "little significance to defendant's decision not to propose a curative instruction"). And, as noted, in such circumstances, we must evaluate whether the curative instruction actually given was sufficient for defendant to have received a fair trial. *Veatch*, 223 Or App at 455.

Nevertheless, in conducting our review, we also must keep in mind that "a mistrial is a drastic remedy to be avoided, and the trial court is in the best position to assess the effect of the complained-of incident and to determine the means necessary to correct it." *Northey*, 340 Or App at 330 (internal quotation marks omitted).

On appeal, at oral argument, relying on *Chitwood*, and *State v. Perez*, 373 Or 591, 606, 568 P3d 940 (2025), the

state argued that in reviewing a preserved motion for mistrial based on improper comments made by a prosecutor, the question before this court is whether *any* curative instruction *could have* been sufficient to cure the prejudice arising from the improper comments, as opposed to whether the particular curative instruction actually given by the trial court was sufficient to cure the prejudice.

The state's position is not without some support in the case law. In *Chitwood*, in considering whether improper statements by the prosecutor during closing argument warranted reversal, the Supreme Court stated that "the standard for our review of a preserved error and for our review of a claim of plain error is identical." 370 Or at 312. It then explained that, in reviewing a claim of plain error, "as in the context of a preserved error, it is not enough for a defendant to show that a prosecutor's comments were improper," and went on to conclude that "a defendant asserting plain error must demonstrate that the prosecutor's comments were so prejudicial that an instruction to disregard them would not have been sufficiently curative to assure the court, in its consideration of all the circumstances, that the defendant received a fair trial." *Id.*

Likewise, in *Perez*, the court stated that "part of [the] rationale in *Chitwood* for requiring a defendant [asserting plain error] to demonstrate that 'an instruction to disregard' the prosecutor's comments would not have been 'sufficiently curative to assure the court, in its consideration of all the circumstances, that the defendant received a fair trial' was that a defendant would need to make an equivalent showing to be entitled to reversal in the preserved context," but noted that that is not always the case: A "defendant whose timely request for a curative instruction is denied may, in fact, be able to establish reversible error even if an appellate court concludes that a curative instruction would have been effective." 373 Or at 606 n 6 (quoting *Chitwood*, 370 Or at 312).

Ultimately, we do not read the discussion of what a defendant must show to establish error in *Chitwood* and *Perez* to sweep as broadly as the state does. In *Chitwood*, the court discussed with approval its decision in *White*, where, as noted, the Supreme Court recognized that the "dispositive

question" concerning a claim of prosecutor misconduct in a preserved posture was "whether the purportedly curative instruction * * * was sufficient to unring the bell." *White*, 303 Or at 342; *see also id.* at 335, 343 (reversal warranted where remarks were prejudicial and "the instruction given by the trial court in an attempt to cure the effect of the remarks was not sufficient to do so," but explaining that "trial judges of this state have ability to tailor an instruction that will point out the reason that the jury is to disregard egregiously improper attempts to influence the jury and thus deny to a defendant a fair trial").

Thus, as framed in *White*, in reviewing a preserved motion for mistrial, the question is not, in the abstract, whether *any* curative instruction could have been sufficient, but whether the instruction given was sufficient. *See Chitwood*, 370 Or at 320 (describing *White* as concluding that "the trial judge had been required to do something more" than it had done to cure the prejudice).

Consistent with the Supreme Court's decision in *White*, under this court's case law, where, as here, a defendant contends that the trial court erred in denying their motion for mistrial and that issue is preserved, we have concluded that the defendant need not demonstrate that "*no* curative instruction could have cured the prejudice to defendant's right to a fair trial * * *." *Veatch*, 223 Or App at 461 (emphasis in original). Instead, the question is whether "the instruction that the court actually gave was insufficient to cure the prejudice." *Id.*

At bottom, we do not understand *Chitwood* or *Perez*—which both concerned review of unpreserved claims of prosecutorial misconduct—to have been intended to alter the standard that appellate courts in this state use to review the denial of a preserved motion for mistrial, as in, for example, *White* and *Veatch*. Instead, we understand the holding of *Chitwood* to reflect that in both the preserved and plain error posture it is not enough for a defendant to show that a prosecutor's conduct is merely "improper"; rather, the question is whether defendant was denied a "fair trial." *Chitwood*, 370 Or at 312. When a defendant fails to move for a mistrial, on appellate review for plain error, we

can assume the trial court would have provided a curative instruction if one was warranted and if defendant had moved for a mistrial; after all, that is the trial court's obligation had the defendant made a timely motion in that circumstance. *Swanson*, 293 Or App at 571 ("[I]t is the court, not defendant, that must decide whether to grant the motion, to cure the effect of inappropriate conduct or testimony by giving a proper instruction instead, or to do nothing at all." (Internal quotation marks omitted.)). But where a defendant does move for a mistrial, as in this case, and the trial court does offer a curative instruction, as in this case, we are no longer operating in the world of the hypothetical. In that circumstance, consistent with *Chitwood*, the question is whether "defendant was denied the right to a fair trial, as a matter of law, *by the events that transpired at trial*." *Id.* at 312 (internal quotation marks omitted; emphasis added).

C.   *The Trial Court Erred.*

        With that understanding of our standard of review, we turn to the merits of defendant's fifth assignment of error in which, as noted, he contends that the trial court erred by denying his motion for a mistrial.

        Defendant argues that the prosecutor's comments during her closing argument had the "combined effect of denying the defendant a fair trial." Specifically, defendant contends that "the prosecutor's statement that defendant showed [J] 'child porn' denied defendant a fair trial because it referred to an inflammatory fact not in evidence"; that the prosecutor's statement that "we are here because [defendant] has a constitutional right to a jury trial" and "not here because there is a dispute in the evidence" denied defendant a fair trial, insofar as it "falsely stated that there was no factual dispute, cast a negative aspersion on defendant's exercise of his constitutional right to a trial, and misstated the presumption of innocence"; and that the prosecutor "twice calling defendant a monster denied defendant a fair trial because it suggested that the jury should convict defendant based on his unsavory character and not based on the evidence."

The state responds that no statement by the prosecutor was so egregious that the only permissible response was to a grant a mistrial. In the state's view, "any impropriety was not so prejudicial as to deny defendant a fair trial, including because the trial [court] provided a cautionary instruction and again instructed the jury after closing argument."

We conclude that, considering the circumstances as a whole, the trial court abused its discretion when it denied defendant's motion for a mistrial.

Because it is perhaps the most prejudicial aspect of the prosecutor's closing argument, we begin with the prosecutor's comments concerning defendant's right to a trial and there being no dispute in the evidence. As noted, the prosecutor stated:

> "[Defendant] disputes the allegations. Defense told you so in opening at the start of trial, but in all reality we are here because [defendant] has a constitutional right to a jury trial. We are not here because there is a dispute in the evidence."

"Although there is no *per se* prohibition on prosecutors referring in closing argument to a defendant's constitutional rights, a prosecutor's reference to or comment on a defendant's invocation of a constitutional right, such as the right to counsel, the right to remain silent, or the right to a trial, may prejudice a defendant's ability to have a fair trial if the jury is likely to draw a *negative inference* from the exercise of that right." *State v. Durant*, 327 Or App 363, 368, 535 P3d 808 (2023) (emphasis in original). "An improper comment on a constitutional right can occur directly, but also through targeted innuendo." *State v. Soprych*, 318 Or App 306, 310, 507 P3d 276 (2022).

Having considered the prosecutor's challenged statements in context, we agree with the trial court that the prosecutor's comments were improper. As an initial matter, by referencing defendant's right to a trial right as being the reason for the trial "in all reality," because there was no "dispute in the evidence," the prosecutor suggested to the jury that the trial was a mere formality, because defendant did

not dispute the evidence against him. *Soprych*, 318 Or App at 311 (error for prosecutor to imply that "obviously guilty people will invoke their right to a trial, and this jury had been called only as a formality, because defendant was one of that group").

Moreover, we agree with the trial court that the prosecutor's comments drew attention to defendant's decision not to testify—and more broadly, defendant's decision not to present any evidence—or at least we think the jury would have understood them that way. And in the context of the prosecutor's closing argument as a whole, which highlighted, as evidence of guilt, the prosecutor's view that "[i]f you didn't do it, you say, 'I didn't do it'" when confronted by the police with an accusation of criminal conduct; we think "the jury [would have been] likely to draw a *negative inference* from" defendant's exercise of his constitutional right not to present evidence, including his own testimony, and to instead put the state to its burden of proof. *Id.* at 309 (emphasis added). That is, the prosecutor, by referencing the defendant's failure to say "I didn't do it" pretrial when speaking to police as evidence of guilt during defendant's trial—*i.e.*, telling the jury that, *"If you didn't do it, you say, 'I didn't do it'"*—and commenting on defendant's failure to dispute the evidence against him at trial, the prosecutor invited the jury to draw a negative inference from defendant's failure to testify or present any evidence in his own defense. Whether framed as a misstatement of the burden of proof and the presumption of innocence (as defendant frames it on appeal), or as an impermissible statement concerning defendant's constitutional right not to testify (as the trial court framed it in its curative instruction), the prosecutor's statement was both improper and prejudicial.

In reaching our conclusion that the prosecutor's statement was improper, we note that this case is meaningfully different than the Supreme Court's recent decision in *Perez*, although *Perez* bears some superficial similarity. In *Perez*, the court concluded that the following statement by the prosecutor was not "plainly improper":

"'*I think oftentimes when you have [t]rial, [the] jury might have a misconception about the purpose of [t]rial*. The [t]rial

is this. Every person has the absolute right to a criminal [t]rial in every case. That should be celebrated. The [s]tate should have the obligation of proving the case to the jury. In this case, the [s]tate submits to you that it has demonstrated that evidence through the production of the testimony. Every element is satisfied. *Just because there is a [t]rial doesn't necessarily mean there's a controversy of fact.* Everybody has a right to [t]rial. I think we should celebrate this process, and I think you should go back and deliberate and return a guilty verdict to every charge. Thank you.'"

*Id.* at 597-98 (emphases and brackets in *Perez*). The defendant in *Perez* did not move for mistrial in the trial court, and the Supreme Court concluded that the prosecutor's statement was not plainly improper, because "whatever the prosecutor's intended meaning was, it is certainly not obvious and beyond reasonable dispute that, by referring to any 'misconception' a jury may have about the 'purpose of trial,' the prosecutor was drawing the jury's attention to defendant's exercise of his right to trial in such a manner that the jury was likely to draw prejudicial inferences from that exercise." *Id.* at 610. Further, the court concluded that the prosecutor's "'controversy in fact' comment did not itself obviously distort the presumption of innocence, \*\*\* or improperly 'impugn' defendant's credibility or implicitly reference evidence outside the record \*\*\*." *Id.* at 612.

In contrast, here, in addition to referencing defendant's right to trial and failure to dispute the evidence, the prosecutor highlighted defendant's failure to say "I didn't do it" during the investigation into his conduct when confronted by police. Consequently, as explained above, the jury was likely to draw a prejudicial inference of guilt from the prosecutor's reference to defendant's failure to dispute the evidence against him or, more specifically, his failure to testify and tell the jury, "I didn't do it," when, as the prosecutor saw it, "If you didn't do it, you say, 'I didn't do it.'"

What remains concerning the prosecutor's statement about defendant's right to a trial and failure to dispute the evidence is whether the trial court's instruction to the jury, coupled with the prosecutor's clarifying statement at the beginning of her rebuttal argument, was "sufficient to unring the bell." *State v. Hylton*, 316 Or App 270, 273,

501 P3d 1081 (2021) (internal quotation marks omitted). We think it was not; it did not clarify that defendant had no obligation to present evidence or cure the prosecutor's implication that the trial was a mere formality. And although it noted that defendant has a right not to testify, and the state is not permitted to comment on it, that was not sufficient. *See Veatch*, 223 Or App at 461 (concluding that "informing the jury that a person has a right to call an attorney and that the state is 'not even supposed to bring it up' does not negate the inference that the person chose to exercise the right because he was conscious of his guilt").

But even assuming the trial court's instruction silenced the bell that the prosecutor struck during her closing argument, the prosecutor's rebuttal argument struck that bell again. That is because, as noted, even after the curative instruction, in her rebuttal argument, the prosecutor again highlighted her view that defendant's failure to say "I didn't do it" when confronted with the allegations against him—this time, with reference to the pretext phone call J's mother made—was not something an innocent person would do. She did so when she told the jury, "If you didn't do it, you'd just say, 'I don't know what you're talking about. I never did any of that.'" That argument would have had the effect of reinforcing the prejudicial inference that the trial court's instruction was meant to dispel. *See id.* at 461 n 5 (in determining whether curative instruction was sufficient, considering conduct by the prosecutor that occurred after the curative instruction that "lessened the effectiveness of the curative instruction," because "[t]he question, ultimately, is whether, by the time the jury deliberated, the adverse inference 'bell' had been sufficiently 'unrung.'"); *see also Hylton*, 316 Or App at 273 ("Despite the trial court's considerable effort to cure the prejudicial effect, we are not satisfied that the instructions in this case achieved the difficult—perhaps impossible—task of negating the inference that [a] defendant invoked [their] rights because of [their] consciousness of guilt." (Internal quotation marks and brackets omitted.)).

Additionally, in our view, the prosecutor's comments referring to defendant as a "monster" were improper. *See State v. Muniz*, 332 Or App 56, 61, 548 P3d 172, *rev den*, 372 Or 763

(2024) ("[I]t was improper for the prosecutor to interject his personal opinion regarding defendant's conduct ***."). Those comments focused the jury on defendant's character—that of a "monster that lurked in [J and J's mothers] home"—rather than whether defendant committed the charged offenses. Given the variety of evidence the state presented about defendant's "sexual proclivities" apart from evidence that he committed the charged conduct—proclivities such as his stated interest in bestiality—we think characterizing defendant as a "monster" was prejudicial, particularly in this emotionally fraught case. *Muniz*, 332 Or App at 63 (considering the "emotionally fraught" nature of the case in evaluating whether curative instruction would have been sufficient to remedy prejudice); *cf. Kellogg v. Skon*, 176 F3d 447, 451-52 (8th Cir 1999) (prosecutor referring to the defendant as a "monster" is an "improper personal expression of the defendant's culpability," and also creates "inflammatory prejudice" by "compel[ling] the jury to focus on the grossness of the alleged conduct, rather than whether the defendant engaged in the conduct," although it was not reversible error in the case, because the remarks did not make "the entire trial fundamentally unfair").[7]

        Finally, we turn to the prosecutor's assertion that defendant had shown J "child porn." It is improper during closing argument for a prosecutor to refer to facts not in evidence. *State v. Morehead*, 307 Or App 442, 449, 477 P3d 462 (2020) ("[C]ounsel is not free, in closing argument, to make statements of fact outside the range of evidence." (Internal quotation marks omitted.)). It is also improper for a prosecutor to "suggest or insinuate that there is more evidence of the defendant's guilt than what the prosecutor has presented at trial." *Perez*, 373 Or at 619 (Bushong, J., concurring). In this case, there was no evidence that defendant possessed child sexual abuse material (*i.e.*, "child porn"), and given

---

[7] The state contends that referring to defendant as a "monster" was not obviously improper, and that the prosecutor used the term "'monster' only in the context of defending [J's mother] and arguing that she should not be blamed for trusting defendant." That is, the state argues, the prosecutor was merely "[r]esponding to the defense's attack on [J's mother's] character."

The prosecutor's impulse to defend J's mother's character is understandable and, in other contexts, perhaps even laudable. But, in the context of a criminal trial, "prosecutors must resist the temptation to attempt to 'level the playing field.'" *Perez*, 373 Or at 620 (Bushong, J., concurring). "That might seem fair, but it is not the way that criminal prosecutions work." *Id.* (Bushong, J., concurring).

the allegations against defendant—that he engaged in sexual contact with a minor—we think the prosecutor's comment stating that he did possess such materials had the potential to significantly prejudice defendant, particularly in light of the ODHS worker's testimony that ODHS had a "concern about [defendant] watching inappropriate child pornography."

To be sure, after defendant objected to the prosecutor's statement regarding "child porn," the prosecutor clarified that she meant "regular pornography." But when considered in conjunction with the variety of evidence the state presented about defendant's "sexual proclivities," apart from evidence that he committed the charged conduct, including evidence about the various types of pornography he possessed, we are not persuaded that the prosecutor's clarification alone, with no further action from the court, was sufficient to remedy any prejudice—that is perhaps demonstrated by the trial court's comments when denying defendant's motion for a new trial that it thought there was "a joint viewing of child pornography."

Thus, in this case, considering the circumstances as a whole, we conclude that the trial court abused its discretion when it denied defendant's timely motion for a mistrial. In reaching that conclusion, we emphasize that we are not concluding that the evidence that the state introduced concerning what defense counsel described as defendant's "sexual proclivities" was irrelevant. Nor are we concluding that the state's argument that the jury should infer defendant's guilt from his purported failure to deny the allegations against him when he spoke with police or during the pretext phone call was improper. But having chosen to introduce potential inflammatory evidence of defendant's "sexual proclivities" and chosen to make arguments concerning defendant's failure to deny the allegations against him at certain times as evidence of guilt, the prosecutor's statements in this case referencing defendant's right to a trial and failure to dispute the evidence, calling defendant a "monster," and referencing defendant possessing "child porn," denied defendant a fair trial, even when considered in conjunction with the curative instruction that the trial court gave.

Reversed and remanded.

**KAMINS, J.,** dissenting.

I disagree that defendant preserved his motion for a mistrial regarding the prosecutor's statements in closing argument, and I write separately because I worry that the majority's approach disincentivizes any and all objections during closing argument.

There is no question that "'[t]he time to move for a mistrial is when the allegedly prejudicial act occurs, not after the incident has been allowed to pass by, for then it is too late for the trial judge to caution the jury and mend the harm.'" *State v. Cox*, 272 Or App 390, 404-05, 359 P3d 257 (2015) (quoting *State v. Shafer*, 222 Or 230, 235, 351 P2d 941 (1960)). Defendant, however, allowed the incident to pass by.

Specifically—and critically—defendant did not object at the time the statements were made. In fact, he did not raise a concern with those statements until after the argument had concluded, and not until the trial court expressed concern. At that point, defendant demanded a mistrial, claiming that the bell—one which he did not even hear—could not be unrung. He then refused to assist the court in fashioning a curative instruction, and now contends—and the majority agrees—that the resulting instruction was insufficient. Had defendant timely objected, however, the trial court would not have had to reconstruct events without assistance from defendant to craft a curative instruction, but rather could have immediately tailored that instruction to mend the harm.

The majority relies largely on *State v. Veatch*, 223 Or App 444, 196 P3d 45 (2008), to support its conclusion that defendant's late motion for a mistrial preserved his argument on appeal. 342 Or App at 784 (citing *Veatch*, 223 Or App at 454). That reliance is misplaced. According to the majority, *Veatch* stands for the proposition that a litigant preserves a motion for a mistrial based on unexpected and improper statements in closing argument not by objecting to those statements, but by waiting until argument has concluded and then moving for a mistrial. *Id.* (citing *Veatch* to support the conclusion that "the motion was made a relatively short time after the statements defendant believed

were objectionable were made"). In *Veatch*, however, the defendant *did* object in the moment, and the trial court understood that objection to be a motion for a mistrial on an issue that the parties had already litigated and that the court had already decided in defendant's favor.

In *Veatch*, the defendant was being investigated for driving under the influence and was asked to take a breathalyzer test. 223 Or App at 447. Before deciding to take the test, he first called his attorney, left several messages, and then called his mother to locate another attorney. *Id.* After waiting half an hour for the attorney to call back, officers told the defendant that he needed to make a decision. He decided to take the breathalyzer test, which indicated that his blood alcohol content exceeded the legal limit. The prosecutor sought to introduce evidence that the defendant made "calls" without reference to the fact that the defendant attempted to call an attorney. The defendant argued that any evidence about the calls should not come in at all and the trial court agreed, ruling that "there could be no mention of telephone calls." *Id.* at 448.

During the prosecutor's examination of the investigating officer, there was mention of not just telephone calls, but that the defendant was trying to call his lawyer:

"Q.  Did you ask [the defendant] if he would take the [breathalyzer] test?

"A.  Yes, I did.

"Q.  How did he respond?

"A.  He wanted to call his lawyer before making that decision.

"[Defense counsel]:  Objection. I have a matter for the court.

"THE COURT:  Sustained. And if I hear that word again—

"[Prosecutor]:  Yeah.

"THE COURT:  —you're going to start all over again."

*Id.* at 448-49. The court then immediately—in the moment—attempted to cure the harm. Specifically, the court advised the jury:

"[A] person has a right to call their lawyer and you're not supposed to make any inferences from that, since they have a right to do it.

"And so the State's not even supposed to bring it up. They brought it up. The seven of us are going to totally ignore it."

*Id.* at 449. At the next break, when the jury was excused for lunch, the defendant moved for a mistrial based on that comment and the court responded, "That's denied still." *Id.*

The question in *Veatch* was whether the statement "Objection. I have a matter for the court" was sufficient to preserve the motion for a mistrial, a motion that was formally made at the very next break in the proceedings. We concluded that the defendant's statement was "sufficient to alert the trial court that he intended to move for a mistrial." *Id.* at 452. The trial court's understanding was reflected in both the trial court's statement to the prosecutor, "[I]f I hear that word again *** you're going to start all over," as well as the trial court's response after the motion was formally made that it was "denied *still*." *Id.* at 449 (emphasis added). The defendant "signal[ed] his intent" to move for a mistrial, the trial court understood that intent and exercised its discretion to handle it with a curative instruction rather than dismiss the jury and entertain argument. *Id.* at 453. We determined that, "[u]nder the circumstances, [the] defendant should not be penalized on preservation grounds because the court chose to respond to the situation as it did." *Id.* That holding was narrow: "Where it is clear that the trial court understands that the defendant intends to seek a mistrial, and it responds by giving a curative instruction, the need for an *immediate* mistrial motion is obviated." *Id.* at 453-54 (emphasis in original).

None of that happened here. When the statements were made, defendant did not even object, let alone signal an intent to move for a mistrial. And, obviously, the trial court did not understand defendant's silence to be a motion for a mistrial, nor did the court take immediate action to cure the statements. That distinction is critical because it governs our standard of review. Rather than inquire, as we would in a plain error context, whether the improper statements were hypothetically curable, we ask whether the

curative instruction given was sufficient. *Compare State v. Perez*, 373 Or 591, 600, 568 P3d 940 (2025) ("[T]o give rise to plain error, a prosecutor's improper jury argument must have been so prejudicial that no curative instruction would have been sufficient to ensure a fair trial.") *with Cox*, 272 Or App at 411 (noting that, in a preserved context, "[t]he dispositive question is *** 'whether the purportedly curative instruction was sufficient to unring the bell'" (quoting *State v. Osorno*, 264 Or App 742, 750, 333 P3d 1163 (2014))). As the majority observes, that standard of review applies because, and only because, the motion for a mistrial preserved defendant's objections. *See* 342 Or App at 788 ("But where a defendant does move for a mistrial, as in this case, and the trial court does offer a curative instruction, as in this case, we are no longer operating in the world of the hypothetical.").[1]

      Under that framing, the majority concludes that the curative instruction was inadequate and for that reason, defendant was denied a fair trial. Specifically, the instruction "did not clarify that defendant had no obligation to

---

[1] The majority relies on *State v. Quebrado*, 372 Or 301, 312, 549 P3d 524 (2024), in advocating for a "pragmatic" approach to preservation that turns largely on whether the trial court or parties raised the issue of the mistrial motion's timeliness. 342 Or App at 784 n 6. However, *Quebrado* spoke to an *exception* to the typical rule that "mistrial motions are favored at the time when the objectionable act occurs." 372 Or at 312. That exception to the general rule was only needed because it was not clear *when* the objectionable act occurred.

The *Quebrado* court explained that "the preservation analysis of mistrial motions requires we address two distinct, but interrelated questions of timeliness—the timeliness of the objection to the act that allegedly created the basis for the mistrial, and the timeliness of the mistrial motion itself." *Id.* at 303-04. In *Quebrado*, which dealt with a confrontation clause violation, the answer to the first question was murky because, in that context, it was not clear whether the objectionable event occurred when the hearsay evidence was admitted *or* when the declarant didn't testify. *Id.* at 304 (reasoning that "the appropriate time to challenge the admission of hearsay evidence on confrontation grounds may *** vary").

We are not in such an atypical situation. Unlike in *Quebrado*, no analysis is required here to determine when the objectionable event—the prosecutor's improper statement—occurred. *See id.* at 310 (contrasting that case's atypical situation to the more typical evidentiary ruling, where "a contemporaneous objection is required because, to challenge an evidentiary ruling on appeal, a litigant typically must object at the time when the challenged testimony is proffered").

And, under that pragmatic approach, the majority considers it significant that the trial court did not express concern with the timeliness of defendant's motion. The fact that the trial court did not comment on the timeliness of the issue it raised *sua sponte* is unremarkable and certainly should not be decisive in the preservation analysis.

present evidence or cure the prosecutor's implication that the trial was a mere formality." *Id.* at 792-93. True enough. But if the curative instruction missed the mark, that is so because of the circumstances defendant himself created. Defendant neither objected at the time the statement was made—which would have allowed for a properly tailored instruction—nor did he offer any guidance as to the curative instruction suggested by the trial court. *Veatch*, which involved an objection—that the trial court understood to be a motion for mistrial—made in the moment that triggered an immediate curative instruction, should not help defendant here.[2]

What's more concerning is that the majority's approach disincentivizes fulsome preservation. Indeed, why would a defendant ever object during a prosecutor's closing argument? Rather, a defendant could simply wait until the argument ends, move for a mistrial based on every statement in it, and offer the trial court no suggestions as to how to cure it. On appeal, then, we would not ask whether the improper statements *could have* been cured, but rather, whether they *were*. Nothing in that approach serves the requirement that a motion for a mistrial must be made when the prejudicial event occurred so the trial court can fix it.

Because I do not believe that the motion for a mistrial is preserved, nor that the prosecutor's statements were not curable, I would affirm the trial court's decision.

---

[2] As the majority recognizes, the trial court later did instruct the jury that defendant "has an absolute constitutional right not to present any evidence" and that a decision not to present any evidence "cannot be considered as an indication of guilt" or "commented on * * * in any way." 342 Or App at 782. That instruction ameliorated any purported deficiency of the curative instruction.